Good morning, and may it please the Court, I'm Don Verrilli for BMO Bank, and I'd like to reserve four minutes for rebuttal, please. You may. Our clock just keeps running, so you'll just need to sit down at that time. The bank was held liable for a half-billion dollars lost by investors in the Petters Ponzi scheme, even though no bank employee profited from or even knew about the scheme or did anything more than provide routine banking services to the company that was a front for the scheme. It took a cascade of legal errors to produce the result below. I will focus, of course, on whatever the Court would like, but if I could, I'd like to start with two related points, one about impari delicto, the other about damages, that I think are really the same point and explain a lot about what went wrong in the Court below. Now, first, on impari delicto, we know from Grasmukh that the defense applies to bankruptcy trustees. So the question is whether PCI's trustee is, whether PCI's trustee's claims are exempt from the defense based on the fact that PCI was in receivership before bankruptcy. The answer is no, and that is because the breach of fiduciary duty claim that the trustee won on below is obviously a claim brought on behalf of the company enforcing its duty, its right of loyalty and its officers, not on behalf of creditors asserting their rights. So under Minnesota law — But the creditors get the benefit here, right? This ends up benefiting the creditors? That's true, Your Honor, but that is true in every case. It's true in cases in which a trustee is bringing claims of this kind in a situation where there wasn't a pre-bankruptcy receivership. So it's a bit of a hackneyed phrase, but I think that's a, it proves too much point because you could always say that same thing in cases involving trustees that weren't in bankruptcy, that weren't, where there wasn't receivership before the bankruptcy, and we know from grassroots that in pari delicto does apply. And I think the key thing here with respect to Minnesota law, Minnesota law does not recognize an exemption from the application of defenses like in pari delicto in cases where the receiver is suing for the corporation and not bringing direct action on behalf of creditors standing in their shoes. Now, if Minnesota law were different, I think Section 541 of the Bankruptcy Code would preempt Minnesota law in cases like this. And in all events, there is no policy reason for reasons, as I just suggested to Judge Benton, why one would treat trustees differently depending on whether there was a pre-bankruptcy receivership or not. And I think that's exactly the mistake that the district court made in holding that in pari delicto was categorically inapplicable. It treated this as though it were a claim, the breach of fiduciary duty claim, as though it were a claim brought directly on behalf of creditors asserting creditors' rights when in fact it was a claim brought on behalf of the corporation asserting the corporation's rights. Now, when we get to damages, the district court made the same mistake. The liability theory, as I said, asserts a violation of the duty of loyalty that PCI's officers owe to the company. But the trial court allowed the trustee to calculate damages based on what the creditors lost as a result of the Ponzi scheme, not what the company lost as a result of the breach of fiduciary duty. That's the looting of the $78 million. So even if the liability verdict were upheld, and I hope the court agrees with me that that can't happen here, at most the damages could be the $78 million looted from the company, not the creditor losses. But circling back, what the damages point underscores, I think, is that the trustee's breach of fiduciary duty claim can't possibly fit within any recognized exemption to in pari delicto, even under Minnesota law, because it asserts, as I said, the company's own rights and not the creditor's rights. So the liability verdict has to be reversed for that reason on in pari delicto. And, of course, you know, in addition to these two points, all of this is overlaid by two fundamental problems. First, we have an adverse inference instruction that we think was given in complete disregard of what the plain text of Rule 37E2 requires, branded us as a bad actor, affected the whole trial. And then, in addition, we think, with respect to the basic aiding and abetting claim, the problem here is that if you take this Court's decision in Zayed as setting the benchmark for these kinds of claims, aiding and abetting in this circumstance, we don't have anything close in the evidence to the kind of actual knowledge that the Ponzi scheme was going on that Zayed says is required. You don't have anything close to the kind of substantial assistance that Zayed said is required. And with respect to that, I'll just make one point, and then if I could, I want to go back in more depth on in pari delicto. And with respect to that point on Zayed, I'd point the Court to page 720 of the Zayed opinion where it's talking about substantial assistance. And the Court applying Minnesota law in Zayed says, first, says two things. First, under Minnesota law, routine professional services, and what Zayed says, including routine banking services, are, as a categorical matter, insufficient to prove substantial assistance for aiding and abetting under Minnesota law. And the reason for that is because it creates too great a risk that professionals, bankers, lawyers, accountants, et cetera, can get swept up and held liable as deep pockets for the misbehavior of their clients. Well, that's the second or third time you've said routine banking services. Did the jury find that these weren't routine banking services? The jury didn't find anything about that one way or another, Your Honor. Are you sure? They weren't instructed about that. Yes, I am sure. They weren't instructed that they had to find something more than routine banking services. And all they found was that this was substantial assistance. And the problem was, in fact, the jury instruction said the substantial assistance was any material assistance. I can get the language for you if you'd like. Sure. Bear with me on that. It may take me a minute to find it. But with respect to substantial assistance, the jury was simply, it was a very bare-bones instruction, and it just said that any assistance that materially advanced the Ponzi scheme or something like that, it did not say anything about assistance beyond routine banking services, which is what Zayed requires. But the term routine banking services was not given to the jury in those three words? Not even close. All there was is a one-sentence generalized instruction about what substantial assistance was. So I think, you know, apart from everything else, you can't get, you have a sufficiency of the evidence problem. Now, I want to go back to inquire delicto, because I do think there's some key points here that are worth stressing. You know, I think the key, the thrust of the argument by my friends on the other side with respect to inquire delicto is that, well, the appointment of a receiver cleanses the corporation of the prior misdeeds or the misdeeds of its prior officers. But that's not the case under Minnesota law. And I think that's clear as a bell if one looks at the Minnesota Supreme Court decision in Magnuson, and that's particularly pages 33 and 34. I think it's at 189 Northwest 2nd, where what the Minnesota Supreme Court says is that the general rule is that the appointment of a receiver does not eliminate defenses to which the corporation would otherwise be held liable. So I think that statement alone by the Minnesota Supreme Court refutes the idea that receivership cleanses the bad behavior of the former management. Then the Court goes on to say there's an exception to that general rule, but it defines the exception very narrowly. It says the exception is when the receiver is suing, steps into the shoes of the creditor, and sues on behalf of the creditor, asserting the creditor's rights. And those are really rights in the nature of fraudulent transfer claims. And, in fact, in Magnuson and in Bonn-Hyver, the second case that my friends on the other side try to distinguish here, there was a State statute that expressly gave receivers of insolvent insurance companies the authority to step into the shoes of the creditors and assert the creditors' rights. So that's what was happening. You don't have to just take my word for it. We cited a Seventh Circuit decision, the Schacht decision, in our brief, and this is in 711F2nd. And it expressly reads those two Minnesota decisions in exactly the way I just described. General rule is receivers are subject to impari delicto and other defenses, narrow exception when they're asserting rights of creditors. That's why the point I made at the outset here I think is so critical. The only claim on which the jury found for the plaintiff here was the claim that we aided and abetted a breach of fiduciary duty by PCI's officers against the company. That's the only thing that they found. On every other claim, they found for BMO. In particular, on the claim that we aided and abetted PCI's fraud of the creditors, it's found for us on that claim. It's only that one narrow claim. And so with respect to that claim, it is obvious that that claim is a claim brought on behalf of the corporation, asserting the corporation's right to loyalty. It is not a claim where the trustee, the receiver before the trustee is standing in the shoes of the creditors. Now, so counsel, what about the statement in many Minnesota cases that the application of impari delicto is reviewed for abuse of discretion? Well, there were a few points about that. So clearly an abuse of discretion to make a legal error. The district court in this case held that impari delicto was categorically inapplicable. That's a legal error. So it was an abuse of discretion. No, I get the circular. But to come to the reality, do you think they're trying to say it's kind of comparative fault? Well, do you read that in some of the Minnesota cases that maybe if you just kind of one percentage fault, because there's fault everywhere in the world. Well, so I guess what I would say about that. But you do if you're getting up toward half. So, well, that's, you know, I think that's where the discretion comes in on the part of the trial court on impari delicto. If you get to the point where the defendant's culpability is equal to or superior to the plaintiff's, then the doctrine, that's when the court's supposed to exercise this discretion. And that's supposed to be material, right, by the jury instruction here? Well. I don't know what percent we put material in. There was no jury instruction here. They wouldn't let us make the defense. How would that work then? If you were right that it was wrong categorically to exclude the defense, how would it be litigated on this question of judgment? Well, the way. Would it be a jury issue? Well, I think in theory it would, as a general matter, it would be a jury issue. In this case, we would win on summary judgment. There was a guilty plea by the corporation. In fact, a guilty plea entered by the corporation at the direction of the trustee after the trustee had been appointed. Okay. So theoretically you say it would be a jury issue if there were a genuine issue of factor. But there's no genuine issue of factor. The guilty plea alone answers all of the questions with respect to whether impari delicto would bar the case. And particularly. Let me ask one other question, if I may. I understood. I think I understand you'd be saying that the fact that. I understand your position about Minnesota law and the bankruptcy code. Does it matter, in your view, whether the receivership is a Federal receivership like here versus a Minnesota state law receivership? I think it reinforces the strength of our point that it's a Federal receivership because it's difficult for me to conceive of any reason why the rule in grass root with respect to trustees generally wouldn't apply to trustees who were Federal trustees before they became, I mean, Federal receivers before they became Federal trustees. But I don't think that. So I think it's reinforcing. I don't think it's a critical point. I think the critical points are the ones I tried to make based on the text of and what I think is absolutely unambiguous about Minnesota law with respect to that. A couple of more points, if I can. You know, apart from everything else that I said at the outset about why I think the liability verdict, in addition to all the additional problems I've identified, can't stand. You know, the whole case really. And remember, to prove any betting, you have to have actual knowledge plus substantial assistance. The plaintiff made an actual knowledge case by making a willful blindness argument to the jury. If you look at the closing, over and over and over again, eight, nine, ten times argued willful blindness. But didn't argue willful blindness as it is correctly understood in the law, under the global text standard, where you have to show a high degree of subjective awareness. Did the district court give an instruction on willful blindness? The district court, Judge Shepard, refused our request. Could you tell me what happened there? I don't understand why you have a term like this, but it was not defined. Yeah. Here's what happened. At the charging conference, we made two points. We said, first, we don't think the evidence in this case rises to the level where a willful blindness could be a basis for finding actual knowledge. So we think that there should be no mention of willful blindness in closing. We said, but if the court disagrees, we are proposing a willful blindness instruction. We proposed the instruction. It contained the language from global text, setting forth the legal definition of willful blindness. The district court refused to give the instruction. We have the cites in our brief to the record for all of that. So we clearly made the request. It was denied. And then the district court said, but the plaintiff can't argue willful blindness in closing. Gave express permission to do so. And plaintiff's counsel went to town on willful blindness. As I said, we looked at that transcript over and over and over again, but not arguing the correct legal system. We don't have an appeal on the instruction, as I understand it. It's just a sufficiency appeal. No, lack of instruction. We've appealed on the lack of giving the instruction. Absolutely. Absolutely, Your Honor. So where does the term willful blindness even come from in the record? So basically. Or is it in some evidentiary part of the record? So there was one document, a sort of training manual, for BMO employees that the plaintiff's lawyer totally went to town on, saying they contained the phrase willful blindness, and it basically described it in a colloquial way, not in the legal way. I mean, it is a legal term of art that requires a very high showing, because it's supposed to substitute for actual knowledge. And the document didn't use it in anything like that way. It was trying to train employees and using colloquial language. And what happened is the plaintiff's counsel took that same colloquial interpretation and went to town with it over and over and over again. And I think you can't help but look at the argument in the transcript and realize how prejudicial it was to fail to give that instruction. I guess you do argue you put it in a section on judgment as a matter of law. You're correct, Your Honor. You're trying to argue now that it's a separate appellate point, that there was an instructional error? Yes. I'm sorry if we weren't sufficiently clear. We were trying to be clear about that. Usually we would get a heading. It was, you know, error to forego the instruction. I appreciate that, Your Honor.  So into my rebuttal time. All right. You may reserve. Thank you. Mr. Clement, we'll hear from you. Good morning, Your Honors, and may it please the Court, Paul Clement for the plaintiffs. I look forward to addressing the aiding and abetting and impaired delicto issues, but first let me start with some context, if I may. This appeal is the result of extensive fact-finding in two courts below. What BMO labels, quote, plaintiff's arguments about document destructions are actually the factual findings of the bankruptcy court, and they are definitive and they are devastating. BMO's actions were, quote, intentional and willful, end quote, and BMO, quote, lied to its counsel, lied to the court, and lied to the plaintiff, end quote. And the jury made its own findings based on its assessment of the credibilities of the witnesses, including BMO's money laundering analyst, who could not begin to explain how she could have cleared dozen of money laundering alerts, testifying that she didn't know or recall over 200 times. Based on testimony like that, it is little wonder that the jury found BMO aided and abetted fiduciary duty violations and awarded punitive damages on a clear and convincing instruction to boot. Counsel, I've got to ask you a question, and neither of you mentioned this. The receivership has had a final accounting and is closed, right? So how can you even be here, for starters? So I can be here because there still is a bankruptcy litigation trust. And, Mr. Kelly, you're here in the bankruptcy case. Well, I'm not in the bankruptcy case. And not as a receiver, because the receivership's gone. But the receivership is gone with the understanding that the litigation trust from this action, it's not the bankruptcy. The bankruptcy case is closed as well. But at the end of bankruptcy, there's an appointment of a litigation trust, trustee, who can continue the litigation and the proceeds of this litigation, as you pointed out, are going to go to the creditors here, who right now have gotten very little, you know, pennies on the dollar at this point. And, you know, unlike what you read in the paper today about FTX, even if we win this Now, if I could go to the impaired delicto issue, which I think is the principal argument my friend makes to try to reverse this jury verdict, I think it should be common ground between the parties that the availability of that defense turns on Minnesota law. The other side has an argument that a bankruptcy code provision, 541C, would preclude that result even if Minnesota law were different. I'm happy to talk about that. But he didn't talk about it much, and I think that's because the argument doesn't work. The argument that says the 541 didn't appear to me at all, particularly the subsection you all dispute, was it really raised below? I don't think it was really raised below, and I think it's Neither of you said that in the briefs, though, right? And so have you waived the fact that the other one didn't raise it? Well, in fairness, Your Honor, I'm a believer that you waive claims and defenses. You don't waive arguments. So I think it's probably fair for them to raise sort of a new argument. But I still think you can take — I still think you can take sort of into account the fact that this argument is sufficiently weak, that it didn't occur to them below. And I think it's telling that no court has ever relied on that provision. Even the courts that go their way have not relied on 541C1B. You're sure it was raised in those cases? I'm sorry to take a star field, but I don't know. I don't know for sure either. But again, if it wasn't even raised in those cases, it shows it's about ipso facto clauses, it's about preventing provisions that would restrict property coming into the estate from being used to limit the property of the estate. So if we get to the Minnesota law issue, which I think is the critical one, my friend and I just fundamentally disagree on the Minnesota law. And I think the Minnesota law is incredibly clear that the appointment of the receiver makes the impera delicto defense unavailable as a matter of law. And in a lot of cases, this Court is asked to make difficult, eerie guesses about state law, but you don't have to make a difficult, eerie guess here because you have the, you know, for better or for worse, Minnesota already had a deal with one Ponzi scheme back in the 1960s, the American allied insurance debacle. And in the context of that, the Court decided not one case but two cases, Magnuson and Bonhiever. And if you focus on Bonhiever, it is crystal clear that the principal argument the bank is making, which is that somehow this cleansing doctrine only applies to claims brought on, that are creditor claims, is dead flat wrong. Bonhiever is a claim for the corporate entity. It is a malpractice insurance claim against the auditors, a negligence claim against the auditors. It is plainly a claim of the entity now in receivership, and it is plain as day that other Minnesota case that my friend doesn't mention to you today, but I think puts a further ---- And Bonhiever does talk about how this receiver represents the creditors. Again, it says that it's operating for the benefit of the creditors, which is the same thing that happens here. And again ---- I thought a bankruptcy trustee operates for the benefit of the entity. But a receiver, a Federal receiver, right in the appointment, it says the reason we're appointing you for this position is in part to get resources back for the creditors. So the claim in Bonhiever, just like the claim here, is a claim on behalf of the corporate entity. It is for the benefit of the creditors. We absolutely know that in Bonhiever, because basically at the point that the damages would have exceeded, it was owed to the creditors that capped it at that amount. But the claim, think about the claim. It's a negligence claim for the accounting services provided to the corporate entity. And if you read Bonhiever, it is plain as day that it's a claim that is brought on behalf of the corporate entity for the benefit of the creditors. Here's the other case that my friend doesn't mention that's a Minnesota case that I think puts the nail in the coffin on his argument, and that is the Greenpond case. And the Greenpond case, which is consistent with this Court's decision in Ritchie against J.P. Morgan, both decided in the context of this very Ponzi scheme, say the claims that we are talking about cannot be brought by the creditors. They can only be brought by the corporate entity. And that is absolutely critical, because, first of all, I don't think Greenpond would have said that if it thought that the innocent creditor's claims could only be brought by the corporate entity and the corporate entity would be barred by in peri delicto. Because that would mean that no matter how innocent the creditors, no matter how innocent the receiver, no matter how bad the bank's conduct, no one could collect a penny. Now, that's a nice argument if you're a bank. But if you're a Minnesota court, that argument has nothing to appeal to you. And as I say, this is not a case where you're going to make a tough guess. The Minnesota courts had to deal with a Ponzi scheme before. And if this case arose in New York, you know, a lot of accountants in New York, maybe the New York courts have a bad rule about in peri delicto. But in Minnesota, having faced this precise situation, the court said, no, we're not going to let in peri delicto get in the way of leaving innocent creditors out in the cold. And as a result, by the time you have Magnuson and by the time you have Bonhiever, the creditors in the American allied Ponzi scheme collect 100 cents on the dollar. And if my friend were right about the law, at least in this context, there's basically going to be no recovery, no meaningful recovery at all. And that can't be the law. And, again, that's why Greenpond and Ritchie are so clear. This whole case to you today depends on drawing this very thin distinction between whether a company in receivership or bankruptcy is suing on behalf of the corporate entity or the creditors. In New York law, and Greenpond makes this clear, that is slicing the bologna way too thin. There's no difference. And, in fact, again, Greenpond says that if the claim is in common to the creditors, the creditors can't bring the claim. The only entity withstanding to bring the claim is the corporate entity. And it's obviously, at least when you're in receivership or when you're in bankruptcy, that is a claim that works to the benefits of the creditors, but it is a claim brought by the corporation. And that's why when you get to his damages argument, there's no anomaly there either. When you think about a Ponzi scheme, it is not true that the only way a Ponzi scheme injures the corporate entity is by the payments to the insiders. That's one way it injures the corporate entity, but there's an entirely separate way it injures the corporate entity, which is to create additional debts to creditors and additional payments out that have nothing to do with the legitimate corporate interests of the entity. So it's not just the payments to the insiders that are problematic. It's the payments to other people that are designed for no legitimate corporate purpose, but only for furthering the Ponzi scheme. And at the end of the Ponzi scheme, you're left with about $1.9 billion in debt. Those are injuries to the corporation. Of course, the parties that are going to recover are going to be the innocent creditors, but that is not only is that the corporation get to bring that claim, but they're the only person that can bring that claim. That rule would make zero sense if the corporate claim were barred by imperi delicto, but the Greenpond case is issuing that decision knowing full well what Bonheimer and Magnuson say, which is that imperi delicto is not a problem in a case like this because the receiver's been appointed. Now, the question is, well, that's been raised is, well, you know, isn't this a little cute because, you know, like otherwise everyone's going to want to have a receiver first? Well, two things, Your Honor. First of all, you can't just push a button and get a receiver. Some statutes will make it pretty quick in insurance in some places. Yes, but only when, you know, the consequence of a receiver is that the corporate insiders are going to get kicked out. So it's not like the bad guys have an incentive to say, oh, we've got a really clever fraud scheme here. We're going to loot all the company, the assets, and then we're going to get ourselves in receivership. I mean, that makes no sense whatsoever. Receivership kicks them out. And under other circumstances, there's a demanding showing before you have a receivership. So I don't think you have to worry about that concern. I think the contrary policy concern, which I think is very real, is if you accept, as I think you have to, that Minnesota law says once you have the entity in receivership, the imper delicto defense doesn't apply. If you then say that defense is somehow resurrected if the receiver takes the company into bankruptcy, then you are creating a real dilemma for the receiver. The receiver has to choose between the benefits of bankruptcy, automatic stay, Federal statutory avoidance actions, but only at the cost of losing the cleansing from the imper delicto defense. Cleansing doesn't appear in Minnesota law, though, correct? No, it's just a shorthand. It's never been used. It's just a shorthand. It's just a shorthand. Go ahead. I'm just trying to explain the concept, which is if I'm a receiver under Minnesota law, I stand there and say, okay, I don't have to worry about imper delicto. I didn't do anything wrong. I'm innocent. The creditors I'm working for here are innocent, so I don't have to worry about imper delicto under Minnesota law. But if my friend is right, if I walk into Federal bankruptcy and get the benefit of the automatic stay, the benefit of the fraudulent conveyance laws, I'm going to lose that sort of immunity. I don't care if you call it cleansing. Call it anything you want. I'm going to lose that immunity from imper delicto defense. Isn't that working for the creditors in bankruptcy? I mean, we had this bankruptcy judge say certain counts were dismissed because they were brought on behalf of the creditors, and the trustee can't do that. He can only sue on behalf of the corporation. So why is that slicing things too thin if it's the basis for what claims can be brought? It's not — I mean, to be clear, I don't think it's as simple as the trustee can't bring claims for the creditors, because I think the fraudulent conveyance claims that they bring under 544, 545, 547, you know, all those statutes, those are on behalf of the creditors. Yeah. But the common law claims that come in under 541, those have to be claims of the corporation. The reason I say it's cutting it too thin is because under Minnesota law, because of Greenpond, as long as they are claims that belong to the creditors in general, not like a specific creditor claim, and that's what the trustee can't bring. But if they are claims that are common to all creditors, Minnesota law, Greenpond makes clear that's a claim that belongs to the corporation, so the corporation gets to bring it. And if you get to bring that kind of claim, it's not going to be that surprising that the damages are measured or end up being a good proxy for the injuries to the creditors. There's nothing anomalous about that. Now, does it matter that this is a Federal equity receivership rather than a State law? Has Minnesota ever, the Minnesota courts ever spoken to Federal equity receivership? So, I mean, it doesn't make any difference. They haven't spoken to it directly, but Greenpond is decided against, I think, the backdrop of Bonhiever and Magnuson. And, again, I can't imagine why Greenpond would say what it did in the context of this very Federal receiver bankruptcy if it didn't think that the claims that can now be brought only by the corporation were not subject to an imperio delicto defense that, as my friend says, would knock it out at the outset. Because, again, the consequence of that, which makes no sense, is that nobody gets to recover, no creditor, no matter how innocent, gets to recover a penny. That might be the rule in New York. That is not the rule in Minnesota. And you know that from Bonhiever. You know that from Magnuson. But you also know it from Greenpond. Now, if I could say just a few things about some of the other issues in the case. On the substantial assistance questions, the knowledge questions, this case is nothing like Zayed. And let me just give you a couple of numbers to bring it home. Thirty-nine money laundering alarms go off. This is not routine banking instruction at all. Thirty-nine alarms go off. They require, as a matter of duty, to investigate those alarms. All 39 are then cleared. And when the witness comes on, here's another number, 200. Two hundred times, Sarah Johnson, the critical witness about these and why these were cleared, says, I don't remember, I don't recall, I don't know. Two hundred times when she's asked basic questions about why are you doing an anti-money laundering alert at all, I don't recall, I don't know. That's their witness's testimony. They have to live with that testimony. There's no surprise why the jury came out the way it is. Another number I think that's worth it. $2 million. Okay. Those are checks to one of the insiders. This is what they say they did to investigate. They called Pedders, the principal schemer here, and they said, hey, are these $2 million checks to Munson, are they okay? And he said, yeah, they're okay. It's for a house. Like, how is that not inculpatory? How does that allow them to clear these things? I mean, you know, all that proves is that they're not defrauding Pedders, that Munson isn't defrauding Pedders. It doesn't mean that the corporation isn't getting looted. Real estate is exactly the kind of things their own manual tells them to do. And all of this from a small business account, no withholding. I mean, they're paying insiders $1 million bonus checks, Merry Christmas, and there's no withholding for taxes or anything like that. Is that some of your willful blindness evidence? Well, you can call it evidence of willful blindness. At the end of the day, it's evidence of actual knowledge. Well, on willful blindness, how was the jury to know what that term means? So on willful blindness, I think they could have, I think they could, they weren't instructed to find willful blindness. They were instructed to find actual knowledge. To be sure. The judge said you can go to town on willful blindness, as I understand it. No, she never said go to town. No, you said you could argue it. You can argue it. Well, I don't know for sure. He says they went to town. I don't know for sure, because if you actually look at the record, we cross-examined their witness about the manual that said willful blindness. There was no objection to that. Their own lawyer said that's fair game because it's in our manual. And then they, we had this back and forth about willful blindness where they didn't want a willful blindness instruction. They got what they wanted. There was no willful blindness instruction here. It's a plain, vanilla, actual knowledge. The bank did not want the instruction. The bank didn't want it. But then Kelly wanted to argue willful blindness and the judge allowed it? Well, they didn't object. You know, what they're complaining about is the closing argument. They didn't object to his ability to argue the point? They didn't object to his arguing willful blindness. And here's the thing. I don't think there's anything to object to, because willful blindness is a form of a way to prove actual knowledge anyway. So this is all a tempest in a teapot. But did anyone offer a willful blindness instruction? There were proposed instructions offered, but every time they offered an instruction, they coupled it with we don't want any willful blindness instruction. But if you're going to instruct on willful blindness, please use our language, not their language. And all of that gets mooted because the judge doesn't instruct on willful blindness at all. She gives a plain, vanilla, actual knowledge instruction to the jury. The jury hears all of this evidence, which is nothing like Zayed and is incredibly damning, and they come back with a verdict that says that they're liable on this  They provided substantial assistance. One other thing just on the jury instructions that I think is worth just getting on the table, there's this back and forth about routine banking services. Well, that wasn't in the instructions, and it should not have been in the instructions, because courts have actually addressed this issue and said, like, don't focus the jury on what's routine banking services. That's not the right test. And, in fact, it leads you away from the correct result, because as this Court's routine banking services, you have to look at knowledge and you have to look at substantial assistance in tandem. And what might be routine if you don't have knowledge ends up not being — ends up being substantial assistance if you have knowledge. If I just call up an Uber driver and get a ride, that's not substantial assistance. If my buddy knows I'm robbing a bank and drives the getaway car, that's substantial assistance. So you can't give the jury an instruction that says routine chauffeuring services because that gets them away from what's actually the right question. Did you provide — did you have actual knowledge? Did you provide substantial assistance? One last point on this. It's not like they didn't argue to the jury, all we did is provide routine banking services. They argued that to a fairly well. But the jury heard all of this evidence, 39 anti-money laundering alerts, being investigated and then cleared and said, the only way all of this happens, the only way you call up Mr. Petters and make sure that, okay, this is for a house, we'll just let those checks go through, that only happens if you have actual knowledge about the fraud. So the jury, all of this was argued in front of the jury. Then when you get to the damages issue, I don't think there's any problem with the damages issues. Again, if you look at the Minnesota law, Green Pond in particular, there's no rule of Minnesota law that says the only thing you get to recover is payment to the insiders. Again, if we wanted to tee this up as our action was aiding and abetting embezzlement, well, then all we get is payments to the insider. But this is aiding and abetting a violation of the fiduciary duties of the insiders to the corporation. Those fiduciary duties were not — were violated when they paid themselves, but they were also violated when they perpetuated this Ponzi scheme for years and additional years because the AML alerts were cleared, there wasn't an SAR, the Federal regulators didn't come in and shut this down. And the result of that is the corporation goes substantially further into debt, innocent creditors are harmed, and my friend says the innocent creditors get nothing under Minnesota law. Minnesota law could not be clearer that it's to the contrary. Thank you, Your Honors. Just on this willful blindness point to make sure, we'll have to look at the colloquy or the instructions conference. But your view is that they asked to have no willful blindness instruction and then never objected or sought one after the judge said the argument would be allowed? Is that right? I mean, I think the way I would put it, which I think amounts to the same thing, is yes, they — it's not an instructional issue. They got — they didn't want a willful blindness instruction at all, and they wanted a plain vanilla instruction. The judge went with the plain vanilla actual knowledge instruction, so it's not an instructional issue. To the extent they have an argument, it's not one they preserve. The argument they would have is somehow if you don't have a willful blindness instruction, you can't argue willful blindness. Or argue it inaccurately, in which case they should object. In which case they should object. Again, they didn't object, you know, good lawyers don't object to closing arguments very often, but they didn't object here for the additional good reason that they'd be wrong. It's not wrong to argue willful blindness is a way of proving actual knowledge. It's not the law that you can — They're arguing that it was misstated, that the meaning of willful blindness was misstated. But again, that's — if that's their argument, it's a pretty subtle one, and it's one they really needed to object to in the — in the closing argument. Thank you for your argument. Mr. Verrilli. Thank you. Several points I'd like to make. First, with respect to whether the 541 issue was raised in the district court, my friend on the other side is just wrong. It was raised in summary judgment. It was raised in appeal from summary judgment. It was raised in Rule 50 unambiguously and extensively. So we raised it for sure. And the lower courts didn't address it, right? Correct. But we raised it. Yeah. Now, with respect to the discussion about impari delicto, a few points. First, the — you know, my friend points to Magnuson. What Magnuson says on page 33, quoting the German-American case, is, The general rule undoubtedly is that the receiver of an insolvent corporation has no greater rights than those possessed by the corporation itself, and a defendant in a suit brought by him may take advantage of any defense that might have been made if the suit had been brought by the corporation. That is what the Minnesota Supreme Court says the general rule is. So everything my friend said about Minnesota law is a gross overstatement. The question is whether this kind of claim fits into the narrow exception. What Magnuson said and what Bonhiever said is that the narrow exception is for claims asserted for the rights of creditors. And with respect to Bonhiever, this is at page 296 of the opinion. It expressly relies on the principle that the receiver is not subject to impari delicto when he, quote, represents the rights of the creditors. Then goes on to say that he's representing the rights of the creditors here because there's a statute that says when a receiver of an insolvent insurance company sues, they can sue representing the rights of the creditors. So that's the nature, that's the extent of the exception. So there's no generic cleansing at all. And Greenpond is certainly not the contrary. Greenpond doesn't say anything about impari delicto at all. There's not a case about impari delicto, and it doesn't say anything about it, and it can't have any bearing on the resolution of that issue. And the other thing my friend doesn't come to grips with in making that argument is that there isn't any reason to think that bankruptcy trustees who are or where there wasn't a receivership appointed before the petition should be subject to a different rule than bankruptcy trustees where there was a receiver. It doesn't make any sense. Just as a policy matter, it doesn't make any sense. But that's the core of their position. Now, with respect to damages, my friend points to Greenpond as a Minnesota authority for the proposition that you can get the harm to the creditors. Well, the very page on Greenpond that my friend relies on is page 657 of the opinion. And there's this ambiguous sentence there. There's a case cited right after it. It's the Madoff case. And it's the page of the Madoff case that says the proper measure of damages is harm to the debtor, not harm to the creditors. It's the page of the Madoff case that rejects the very argument that my friend on the other side is making. And it's the only cite there, the only one. So it obviously doesn't mean what he says it means. It doesn't come close. Now, a few other points with respect to willful blindness. Let me clear this up. We argued in the alternative at the charging conference. We said, first, it should be categorically out because there isn't enough evidence to even justify any argument about willful blindness. But if you disagree with us, here's the jury instruction we want you to give. And the judge did two things. The judge rejected the jury instruction and then green-lit the argument about willful blindness. So we — the judge had already pre-decided the question of whether plaintiff's counsel could argue willful blindness in the closing. The problem was that we wanted the jury instruction. So why didn't you ask for the instruction if the judge had pre-decided it? Why were you still arguing no instruction? We weren't. Oh, I thought you just said our position was you shouldn't instruct it often.  We argued at the charging conference in the alternative. Yeah, I understand. First, don't let them argue this at all. But if you're going to let them argue it, you have to give this instruction. Oh, I thought when you said the judge had pre-decided it, you meant before that point. No, no. Pre-decided at that conference so that it was pre-decided by the time of closing, which is why we didn't object. Yeah. When the judge pre-decided it at that conference, did the bank say, well, we want the instruction? Yes. Yes. That was the whole point. And, you know, the Court can look at the record and see, but that was the whole point. We say, you've got to give this instruction. You can't just let him go in there and say whatever he wants about willful blindness. You're going to let him do it. That was the problem. And then, as you can see, with respect to that, he relied on it very heavily. A couple more points, if I could. My friend made a big deal about all that evidence about suspicious activity reports, et cetera, and perpetuating the Ponzi scheme. I'll just remind the Court, the jury found for the bank on the claim of whether we aided or abetted the Ponzi scheme, not for the plaintiff. What the jury found for the plaintiff on was that we aided and abetted the breach of fiduciary duty, the looting of the company. And so that's the proper focus. And then last, if I could, you know, my friend started with a focus on spoliation and how horrible it all was. I just want to make a point about this, if I could. And I just would like the Court to look at what the district court actually relied on in finding that we had an intent to destroy evidence for the purpose of keeping it out of their hands for litigation. And this, I think, in particular, focus on page 327 in the appendix. This is the district court's opinion. And there, what the district court says is, and we're talking about these tapes destroyed in 2010, which is the vast majority of the missing documentation. Go ahead. Your time has expired, but we'll hear your point. So it says four, well, there are four facts here, that the tapes were destroyed after district court enjoined destruction, after the issuance of litigation holds, without making any effort to review the contents, and without obtaining input from counsel. None of that proves knowledge, much less intent to destroy. And then so what the district court said, yeah, but in any event, we can impute intent because eight years later at a hearing in 2018, we, the lawyers, seem to be trying to hide something. And we can impute the, from there and trying to hide something in 2018, an intent to destroy evidence for the purpose of keeping it out of litigation in 2010. And just the last point I would make is Your Honor's Morris opinion says. Back on the other is your last point. We're running out of last points. This is the last point of my last point. All right. I just want to, I want to point to Your Honor's opinion and Morris. All right. My opinion specifically says you have to make a context-specific judgment. Look at the particular people, the particular time frame, the particular context. Very well. That decision was a gross violation of that. Thank you.